UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| DEBRA A. JACKSON, | **REPORT AND RECOMMENDATION** |
| Plaintiff, | |
| | 06-CV-0213(T)(M) |
| v. | |
| JO ANNE B. BARNHART, Commissioner of Social Security, | |
| Defendant. | |

---

This case was referred to me by Hon. Michael A. Telesca to hear and report in accordance with 28 U.S.C. §636(b)(1)(B) (Dkt. #17). Before me are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) (Dkt. ## 8, 10). For the following reasons, I recommend that defendant's motion be DENIED, and that plaintiff's motion be GRANTED in part and DENIED in part.

## PROCEDURAL BACKGROUND

Pursuant to 42 U.S.C. §405(g), plaintiff seeks review of the decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits ("SSD") and Supplemental Security Income ("SSI") (Dkt.#1). Plaintiff filed applications for SSI and SSD on or about March 22, 2000 (T18[1]). A hearing was conducted on both claims before Administrative Law Judge Timothy M. McGuan on June 8, 2004 (T16-27). Plaintiff was represented at the hearing by William C. Bernardi,

---

[1]    "T" refers to the administrative record.

Esq. (T483).  On September 9, 2004, ALJ McGuan issued a decision denying plaintiff's

claims on the ground that plaintiff was not disabled and had not been disabled at any

relevant time with respect to the pending applications (T33-37, see T54-58).  ALJ

McGuan's determination became the final decision of the Commissioner on February 6,

2006 when the Appeals Council denied plaintiff's request for review (T6-8).


## FACTUAL BACKGROUND

A.     **Medical Evidence**

  1.     **Plaintiff's Alleged Mental Impairment**

Plaintiff underwent an outpatient psychiatric assessment at Horizon

Human Services on February 19, 1996 after she was referred by a friend for anger and

depression (T264-66).  Plaintiff was diagnosed with major depressive disorder (Id.).  Her

Global Assessment of Functioning ("GAF") score was 55[2] (Id.)

From February 1996 to March 2004 plaintiff was treated sporadically at

the Elmwood Health Center for depression and various physical ailments, including

breast cancer (T294-316, 337-346). In a February 1996 assessement plaintiff 's mood was

rated as depressed and anxious (T305).  Plaintiff was diagnosed with "major depression,

single episode, moderate" (T313).

From February 10 through 16, 2001 plaintiff was hospitalized for suicidal

ideations (T224).  Plaintiff reported no hallucinations, and was alert and fully oriented

---

[2]      "A GAF between 51 and 60 indicates moderate symptoms or moderate difficulty in
social, occupational or school functioning ".  Cruz v. Astrue, 2008 WL 597194, *4 n. 10
(E.D.N.Y. 2008).

(Id.).  Her GAF upon admission was between 11 and 20 (T224).[3]  Plaintiff was diagnosed

with bipolar disorder and prescribed medications (T224-225).  At discharge, plaintiff's

GAF improved to 60, she had no suicidal ideations, her cognitive function was intact, and

she had "excellent insight into her present illness" (T225).  Plaintiff was discharged to

home and placed with Horizon Health Services for counseling and treatment (Id.).

On March 6, 2001 a comprehensive mental health assessment was

performed at Horizon Health Services, which found that plaintiff had a GAF of 55, and

diagnosed plaintiff with "major depression, recurrent" (T263).  At that time, her

atttention, concentration and orientation were rated as "good ", but her dailiy activities

and social interation were rated as "poor " (T262).  An initial psychiatric assessment was

performed by Jin Soo Rhee, M.D. on September 4, 2001, which found that her GAF was

50 (T473).

From February 2002 through April 2002, plaintiff treated with Augustine

Diji, M.D., who reported that her condition was stable and that there were no side effects

from her medication (T357-361).  From July 2002 to June 2004 plaintiff treated with

Ramesh Konakanchi, M.D., a psychiatrist (T392-415).  Dr. Konakanchi examined

plaintiff on numerous occasions (T393-415, 469-471), and prescribed plaintiff various

medications as reflected on the customer history report from her pharmacy (T186-188).

Dr. Konakanchi's notes are largely illegible.

---

[3]      A GAF score of 20 "indicates some danger of hurting self or others (e.g. suicide attempts
without clear expectation of death; frequently violent; manic excitement".  Kocsis v. Standard
Insurance Co., 142 F. Supp. 2d 241, 246 (D. Conn. 2001).

During this period, plaintiff also attended counseling sessions with Cynthia McPhaden, MA, CRC and Gilda Rodriguez, CSW (T417-471). In May 2002, plaintiff reported that recent episodes of de-compensation made her seek treatment and "take her medications again ", and when "she is feeling well she has a pattern of discontinuing taking her medication." (T452). Plaintiff's functioning was rated as stable and her progress was rated as moderate throughout, with the exception of her progress being rated as minimal in July 2002 and May 2003 and her functioning rated as unstable in May 2002 (T455, 452-467).

On July 8, 2003 plaintiff reported "depressed mood which she is managing" (T445). On July 28, 2003, plaintiff "states compliance [with] med order and reports [increased] relief of sy." (T441). On August 12, 2003 plaintiff "has been non-compliant [with] meds . . . started back [with] meds last night and this morning " (T439). In December 2003 and January 2004, plaintiff's treatment notes indicate that she reported baseline auditory hallucinations and some "racing thought" (T427-430). In December 2003 a six-month utilization review completed by Horizon Health Services noted that plaintiff was managing her symptoms (T432). In May 2004, plainitiff reported compliance with the medication and her mood and affect were "cheerful and bright " (T418). Plaintiff missed approximately 18 appointments during this period, and her absenteeism was so frequent that in June 2003 Counselor McPhaden indicated that plaintiff would be terminated if she did not attend her next appointment (T447).

Counselor McPhaden completed a Medical Treating Source Statement dated July 6, 2004 indicating that plaintiff had good ability to understand and remember

very short and simple instructions, and fair ability to maintain regular attendance and to be punctual within customary tolerances (T363).  However, she "was unable to assess work like activities due to limited contact with client in the context of counseling. [Plaintiff] generally displays difficulty with keeping schedule/appointments.  [Plaintiff's] symptoms have vacillated over time." (T364).

2.     **Consultative Examinations**

On May 16, 2000, M. Cheryl Butensky, M.D., a psychiatrist, conducted a consultative psychiatric examination of plaintiff (T317-21).  She noted that plaintiff was able to maintain personal hygiene and perform household chores (T320).  Dr. Butensky diagnosed plaintiff with panic disorder, dsythmia, major depression (recurrent), and bulimia.  Her prognosis of plaintiff was fair, noting that plaintiff "does appear to have gotten a very good handle on her depression and appears to managing that well " (T320). Plaintiff reported

> "the ability to work as long as it does not overtax her capacity to deal with the stress of a job.  Certainly, she needs to be in low-stress environment which allows her some flexibility should she experience panic attacks when she is on the job, but certainly appears to have at least average intelligence, has a work history and appears to be a competent employee, although requiring a low-stress situation with a flexible employer.   There may be some limits on how long she could work on any given day and this should be checked with her treatment providers and perhaps her current work supervisor" (T321).

On May 29, 2002 plaintiff was examined by Thomas Dickinson, Ph.D., a licensed psychologist, who diagnosed plaintiff with bipolar disorder and found that she

would have trouble performing tasks in a consistent and reliable manner, even though she could relate adequately with co-workers, supervisors and customers (T268-272). Dr. Dickinson opined that plaintiff could "perform tasks of repetitious type with supervision [and] can maintain her attention and concentration for job duties and make appropriate job decisions, [but] would have  have trouble performing tasks in consistent and reliable manner but could learn new assignments " (T271).  He also found that "she could relate adequately with coworkers, supervisors, and customers.  Stress situations, time pressures, and distractions would be hard. . . .   When matters are more stable, we would think of referral to the Office of Vocational Rehabilitation for practical job counseling" (T272).  Dr. Dickinson rated plaintiff 's prognosis as "fair with counseling and medication" (Id.).

On June 28, 2000 Hillary Tzetzo, M.D., a non-examining State agency consultant, completed a Psychiatric Review Technique Form (T324-332) which indicated that plaintiff possessed a "slight" restriction in her activities of daily living, "moderate" difficulties in maintaining social functioning, and "seldom" had deficiencies in concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (T331).  Dr. Tzetzo further found that plaintiff experienced one or two episodes of deterioration or decompensation (Id.).  Dr. Tzetzo also provided a Mental Residual Functional Capacity Assessment  (T333-36), which noted that plaintiff was "not significantly limited" to "moderately limited" in all areas of mental functioning, with the exception of her ability to interact appropriately with the general public, which was "markedly limited" (T324).  Dr. Tzetzo opined that "despite [plaintiff's] anxiety . . . if she

continues to comply with . . . treatment recommendations she should be able to understand and follow basic work directions in a low contact work setting, maintain attention for [illegible] work tasks, relate adequately to a supervisor for such work tasks, and has judgment to make basic work related decisons in a low contact work setting " (T335-36).

On June 10, 2002,  H. Szymanski, M.D., a non-examining State agency consultant, completed a Mental Residual Functional Capacity Assessment (T275-78), in which he opined that plaintiff was "not significantly limited " to "moderately " limited in all areas of functioning (T275-276).  Dr. Szymanski also completed a Psychiatric Review Technique Form (T279-292), in which he opined that plaintiff experienced moderate difficulties in social functioning, one or two episodes of decompensation, and mild difficulties with activities of daily living and concentration (T289).  Dr. Szymanski concluded that "on balance, [plaintiff] can understand and remember instructions, sustain and persist at simple tasks, carryout the social demands of a low contact setting and adapt to change" (T291).

B.      **Administrative Hearing Conducted on June 8, 2004**

1.      **Plaintiff's Testimony**

Plaintiff, who was forty-three years old at the time of the hearing, conceded that she was not claiming any physical disability (T497).  Plaintiff testified that she could not work because "I get tired and I get confused and anxiety . . . I have panic attacks " (T493).  She testified that her medication makes her tired and that she had advised her doctors of this side-effect (T493-494).  Plaintiff testified that she only feels stable

-7-

approximately one month out of the year (T503-504), and because of this she has been

unable to work since June 15, 2001 (T474).  Her last job was at a local restaurant where she

served tables and washed dishes (Id.).  Due to her confusion and inability to take

customers' orders, plaintiff was only able to work a total of three to four hours a week,

which resulted in her termination  (T489-491).  Plaintiff's other past employment included

work at a Laundromat, Salvation Army, and Goodwill (T82, 490, 492, 499).

Plaintiff testified that she had a tenth grade education (T489), and had

earned a general office assistant certificate, and not an Associate's Degree from Erie

Community College as she had originally told her counselor (Id.).  The reason for plaintiff's

misrepresentation was that she wanted to "build herself up" (T500).   Plaintiff also

admitted that she was charged with shoplifting during her manic phase and received

counseling for impulse control (T502-03), and was also convicted of welfare fraud in 1984,

but made restitution (T505).


2.     **Plaintiff's Niece's Testimony**

Plaintiff's niece, Hadassah Anita Jordan, testified that she assisted her aunt

for the last two years (T507).  Ms. Jordan went to plaintiff's home four or five times per

week to assist her with errands, attended doctor's appointments, and taking her medications

(T507).  Ms. Jordan also attended plaintiff's counseling sessions and told her psychiatrist

about her observations of plaintiff's behavior (T507, 513).   Ms. Jordan described that

"sometimes [plaintiff] is real depressed where she doesn't  want to get out of the bed . . .

wash up . . . brush her teeth . . . comb her hair . . . or do anything . . . she barely even wants

-8-

to eat" (Id.).  Plaintiff feels well only "a day here or there", and that her medications make

her feel sick (T509, 512).  Ms. Jordan also testified that plaintiff does not have good

judgment of her capacities (T513).


### 3.   ALJ McGuan's Decision Dated September 9, 2004

ALJ McGuan found that (1) plaintiff had not engaged in substantial gainful

activity since the alleged onset date of June 15, 2001; (2) plaintiff's major depression

disorder is a severe medically determinable impairment; and (3) plaintiff's impairment did

not meet or equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4

(T26).

ALJ McGuan concluded that plaintiff had the following residual functional

capacity:  "She has no exertional limitations, however, she has the following non-exertional

restrictions.  She can occasionally understand, remember and carry out complex and

detailed tasks and occasionally interact with the public.  She can do simple work" (T24-26).

In reaching his conclusion, ALJ McGuan rejected plaintiff's complaints as not credible

because they were inconsistent with the evidence in record (Id.).  He also rejected the

testimony of Hadassah Jordan, plaintiff's niece, citing, *inter alia*, that her testimony was

"rather vague." (T25).

Based on plaintiff's RFC and the fact that her former jobs did not qualify as

"past relevant work" under 20 C.F.R. §404.1565 and 416.965, ALJ McGuan concluded that

plaintiff could not perform any of her former occupations (T25).  At Step 5 of the

sequential evaluation process, ALJ McGuan found that "[plaintiff] is able to do other

simple work that would require her to have little direct contact with the public or other co-workers. Thus, the non-exertional limitations do not significantly erode the job base at all levels" (T125). "Since it is found that the claimant's non-exertional limitations do not significantly compromise the ability to perform work at all exertional levels, the application of section 204.00 of Appendix 2, Subpart P, Regulations No. 4 is appropriate as a framework for decision-making. Therefore, it is found that the claimant is not disabled using that criteria." (T26). Consequently, ALJ McGuan concluded that plaintiff was not disabled at any time through the date of his decision (T27).

**DISCUSSION AND ANALYSIS**

**A.     Scope of Judicial Review**

The Social Security Act states that, upon review of the Commissioner's decision by the district court, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. §405(g). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion". Consolidated Edison Co. of New York, Inc. v. NLRB, 305 U.S. 197, 229 (1938).

Under this standard, the scope of judicial review of the Commissioner's decision is limited. This Court may not try the case *de novo*, nor substitute its findings for those of the Commissioner. See Townley v. Heckler, 748 F. 2d 109, 112 (2d Cir. 1984). Rather, the Commissioner's decision may be set aside "only where it is based on legal error or is not supported by substantial evidence ". Balsamo v. Chater, 142 F. 3d 75, 79 (2d Cir.

-10-

1998).  If supported by substantial evidence, the Commissioner's decision must be sustained "even where substantial evidence may support the plaintiff's position and despite that the Court's independent analysis of the evidence may differ" from that of the Commissioner.  Martin v. Shalala, 1995 WL 222059, *5 (W.D.N.Y. 1995) (Skretny, J.).

However, before deciding whether the Commissioner's determination is supported by substantial evidence, I must first determine "whether the Commissioner applied the correct legal standard".  Tejada v. Apfel, 167 F. 3d 770, 773 (2d Cir. 1999). "Failure to apply the correct legal standards is grounds for reversal." Townley, supra,  748 F. 2d at 112.


**B.      The Disability Standard**

The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §1382c(a)(3)(A).  The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . ." 42 U.S.C. §1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

"1.     The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.     If not, the Commissioner considers whether the claimant has a severe impairment which limits his or her mental or physical ability to do basic work activities.

3.     If the claimant has a severe impairment, the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.     If the impairment is not listed in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.     If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.  The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps."

Shaw v. Chater, 221 F. 3d 126, 132 (2d Cir. 2000).


**C.     Did ALJ McGuan err in failing to re-contact Dr. Konakanchi?**

Plaintiff contends that the ALJ McGuan erred in failing to re-contact her treating physician, Dr. Konakanchi, for a legible copy of his treatment notes to further develop the record (Dkt. #11, pp.16-17).  In response, the Commissioner argues that because there was sufficient evidence for ALJ McGuan to conclude that plaintiff was not disabled, he did not have an affirmative duty to re-contact Dr. Konakanchi (Dkt. #13, pp. 2).

Generally, the Commissioner must give controlling weight to the opinion of a treating physician if the opinion is well supported by medically acceptable clinical and

-12-

diagnostic techniques and not inconsistent with other substantial evidence in the record,

such as the opinions of other medical experts.  See Halloran v. Barnhart, 362 F. 3d 28, 32

(2d Cir. 2004).  However, the "Second Circuit has made clear, . . . that an ALJ cannot

simply discount a treating physician's opinion based on a lack of clinical findings that

accompany that opinion.  Rather, the ALJ has an affirmative duty to develop the record and

seek additional information from the treating physician, *sua sponte*, even if plaintiff is

represented by counsel".  Colegrove v. Commissioner of Social Security, 399 F. Supp. 2d

185, 196 (W.D.N.Y. 2005) (Larimer, J.).  This obligation only arises when the ALJ "cannot

ascertain the basis of the opinion from the case record".  Mendez v. Barnhart, 2007 WL

186800, *12 (S.D.N.Y. 2007).  Accordingly, it is insufficient for the ALJ to merely assert a

conclusion about the treating physician's opinion without supplying supporting facts

because in so doing ". . . the ALJ [comes] dangerously close to . . . substituting his own

judgment for that of a physician".  Brown v. Apfel, 174 F. 3d 59, 63 (2d Cir. 1999).

      Here, Dr. Konakanchi treated plaintiff from 2002 through 2004.  Despite

indicating that Dr. Konakanchi's notes were "virtually unnreadable",  ALJ McGuan found

that he "does not say that the claimant was disabled . . . . [T]he entire records from Horizon

Health Services do not provide much in terms of clinical observation and really nothing to

show that the claimant has depression to the extent that it is disabling" (T23).

      "The failure to gather [legible copies of Dr. Konakanchi's treatment notes]

is especially problematic in light of the fact that he was a treating physician whose opinion

must be given special evidentiary weight".  Seltzer v. Commissioner of Social Security,

2007 WL 4561120, *10 (E.D.N.Y. 2007).  ALJ McGuan should have obtained  "more

detailed and clearer statements from her treating physician[ ], especially since the medical

records which appear in the administrative record are often illegible". Miller v. Barnhart,

2004 WL 2434972, *9 (S.D.N.Y. 2004).   "There is no way for this court to determine

whether the illegible information in these reports might have provided further support for

plaintiff's claim." Id.  Accordingly, I recommend that this case be remanded to the

Commissioner with instructions to reconsider his findings after he clarifies the content of

Dr. Konakanchi's treatment notes.


**D.**    **Was ALJ  McGuan's RFC Assessment Supported by Substantial Evidence?**

Plaintiff asserts that substantial evidence does not support ALJ McGuan's

finding that plaintiff's RFC would allow her to sustain regular full-time work (Dkt. #11, pp.

17-18).  In response, the Commissioner argues that ALJ McGuan's RFC was adequately

supported by the opinions of State agency medical consultants, consulting examiners, and

clinical findings from treating sources (Dkt. #13, p. 3-5).

The Social Security regulations define RFC as "the most a [claimant] can

still do despite [his/her] limitations."  20 C.F.R. §404.1545(a)(1); See also S.S.R. 96-8p,

1996 WL 374184,  *7 (RFC is "an individual's ability to perform sustained work activities

in an ordinary work setting on a regular and continuing basis . . . 8 hours a day, for 5 days a

week or an equivalent work schedule".).  The ALJ must assess a plaintiff's RFC based on

all the relevant evidence in the case record.  See Balsamo, supra, 142 F. 3d at 80-81.  The

RFC assessment must include a discussion describing how the evidence supports each

conclusion, citing specific medical findings and non-medical evidence, such as daily activities and observations. See S.S.R. 96-8p, 1996 WL 374184, *7.

ALJ McGuan found that plaintiff had "no exertional limitations, however, she has the following non-exertional restrictions. She can occasionally understand, remember and carry out complex and detailed tasks and occasionally interact with the public. She can do simple work" (T24).

I find that ALJ McGuan's assessment of plaintiff's RFC is supported by substantial evidence. Although plaintiff was affected by her depression and could not perform her past relevant work, the medical evidence establishes that the impact of her impairment was not severe enough to prevent her from engaging in any kind of work. For example, on May 16, 2000, Dr. Butensky found that plaintiff had only slight difficulty with sustained concentration (T320-21). Dr. Butensky concluded that plaintiff needs to be in a low-stress work environment which would allow her some flexibility should she experience panic attacks when she is on the job (T321).

Likewise, Dr. Dickinson concluded that plaintiff "can follow and understand simple directions and perform tasks of repetitive type with supervision. She can maintain her attention and concentration for job duties and make appropriate job decisions. I think she would have trouble performing tasks in consistent and reliable manner but could learn new assignments. She could relate adequately with coworkers, supervisors, and customers. Stress situations, time pressures and distractions would be hard" (T271).

Dr. Szymanski also found that plaintiff was not significantly limited in her ability to understand and remember detailed instructions, to make simple work-related

-15-

decisions, and to carry out very short and simple instructions (T275).  Dr. Szymanski

concluded that plaintiff "can understand and remember instructions, sustain and persist at

simple tasks, carry out the social demands of a low contact setting and adapt to change"

(T291).

Moreover, the findings of these consultive examiners are supported by the

findings of plaintiff's treating sources contained in the record.  Plaintiff's legible progress

notes repeatedly indicated that her level of functioning was stable (T357, 358, 361, 418,

420, 427, 436, 437, 439).  Plaintiff's treating counselor completed a July 6, 2004 Medical

Source Statement in which she noted that plaintiff retained a good ability to understand and

remember very short and simple instructions (T362), but had substantial decline in ability

to maintain attention and concentration for an extended period of two hour segments (Id.).

Counselor McPhaden also found that plaintiff had an unlimited ability to ask simple

questions, request assistance and to be aware of normal hazards (Id.).  However, Counselor

McPhaden stated that she was "unable to assess work-like activities due to limited contact

with client in the context of counseling" (T264).

Therefore, I find that the reports of the consulting physicians and treating

counselor provide sufficient medical evidence supporting ALJ McGuan's RFC assessment.


**E.      Did ALJ McGuan err in finding that plaintiff's subjective complaints were not
         credible?**

Plaintiff argues that ALJ McGuan's credibility determination concerning

plaintiff's subjective complaints was not supported by substantial evidence (Dkt. #11, pp.

18-19).  In response, the Commissioner contends that ALJ McGuan properly determined

that plaintiff's subjective complaints were inconsistent with the medical evidence (Dkt.

#13, pp. 6-7).

       The ALJ is required to evaluate a claimant's credibility according to the

factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

> "We consider all your symptoms, including pain, and the
> extent to which your symptoms can reasonably be accepted
> as consistent with the objective medical evidence and other
> evidence. By objective medical evidence, we mean medical
> signs and laboratory findings as defined in § 404.1528 (b)
> and (c). By other evidence, we mean the kinds of evidence
> described in §§ 404.1512(b)(2) through (6) and
> 404.1513(b)(1), (4), and (5), and (d). These include
> statements or reports from you, your treating or nontreating
> source, and others about your medical history, diagnosis,
> prescribed treatment, daily activities, efforts to work, and any
> other evidence showing how your impairment(s) and any
> related symptoms affect your ability to work. We will
> consider all of your statements about your symptoms, such as
> pain, and any description you, your treating source or
> nontreating source, or other persons may provide about how
> the symptoms affect your activities of daily living and your
> ability to work". 20 C.F.R. § 404.1529(a).

With respect to plaintiff's credibility, ALJ McGuan found:

> "the claimant has complained of isolating herself.  However,
> she has not made other complaints to any great extent
> regarding sleep, eating, except to over eat on occasion,
> memory, attention or concentration problems.  She
> complained of flashbacks because of being sexually abused,
> but has not specified how this affected her.  The claimant
> would not discuss this with her treating source.  She also has
> been non-compliant with medication.  This has been shown
> by taking it until she claims she has felt well and then
> stopped.  There is a note in the file . . . that indicates she had
> not had a prescription filled for almost two months near the
> end of 2003 . . . .

The claimant has been non-compliant with treatment as noted by the many missed appointments. Even her counselor in July 2004 stated that she could not provide an assessment of her ability to do work related activities because of her 'limited contact' with the claimant.

The claimant's testimony has been inconsistent with the medical evidence of record. She claimed that she was tired all the time and confused. She said that she has told her doctor that the medications have made her tired. This has not been borne out by the record. In fact, except for five different occasions, the doctor noted no side effects from her medications. In all of the treating notes, there is no complaint of confusion and none is noted by any treating source. On one occasion, she claimed to be depressed, but the writer noted that she was not. The psychiatric consultative examination in May 2002 stated that the claimant's attention, memory and concentration were intact and her cognitive function was rated as average.

In view of the above, the administrative law judge concludes that the claimant's allegations are not credible. It should also be noted that she has not been truthful in the past as she as committed welfare fraud and even told one consultative examiner that she had an associate's degree when she only completed 10th grade . . . also, the claimant's niece testified that she accompanied her aunt to her treating sessions and told the counselor what she had observed about her aunt. She claimed her aunt could not be around others and would tell people she could do things when she really cannot. This is found to be rather vague, however, there is nothing in the record to indicate that the niece attended any session, and there is no mention by the writer about any observation from her. It appears reasonable that had she told the counselor these things, they would have been in the record. Further, there is no treating source who says that the claimant was disabled and except for a hospitalization in February 2001, prior to the alleged onset date, there are no hospitalizations or emergency room treatments" (T24-25).

I conclude that ALJ McGuan properly discounted plaintiff's subjective complaints. Plaintiff 's testimony displayed various inconsistencies. For example, contrary

to plaintiff's allegation that her medications made her tired, her medical records note very few side effects from her medications (T401, 402, 404, 405).  She also testified that she did not like being around people and did not spend time with people (T500).  However, she advised Dr. Dickinson that she "had some lady friends" (T27).  Even Counselor McPhaden confronted plaintiff on one occasion concerning the contradiction between her "cheerful and bright mood " and her claim that she was depressed (T418).

Plaintiff also reported to her counselor that her medications relieved her symptoms (T441-452), but was non-compliant with her medication regimen and missed numerous appointments with her counselors (T422-26, 428-29, 431, 435, 438, 443, 447, 449-50, 453, 457, 459-60, 463, 466).  These facts weigh against plaintiff's credibility.  See Guilliams v. Barnhart, 393 F. 3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility"); 20 C.F.R. 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled").

Additionally, plaintiff 's own admitted misrepresentation concerning her educational background and her previous conviction for welfare fraud affect her credibility (T500, 502, 505).  Although plaintiff alleges that this conduct was attributable to her condition (T19), there is no medical support for this contention in the record, especially since the alleged onset of her disability was in 2001, long after her 1984 welfare fraud conviction.

While plaintiff attempted to butress her subjective complaints with her niece's testimony, Ms. Jordan's testimony is also not supported by the record.  Most

-19-

notably, Ms. Jordan testified that she accompanied plaintiff to her counseling sessions and spoke to her counselors about her observations of plaintiff (T507, 513). However, as highlighted by ALJ McGuan, this is simply not reflected in any of the treatment notes.

Therefore, I conclude that ALJ McGuan properly found that plaintiff's subjective complaints were not credible.


**F.    Did ALJ McGuan err in relying solely on the Grid?**

Plaintiff argues that ALJ McGuan erred in relying on the Grid because a vocational expert was necessary to assess plaintiff's non-exertional limitations (Dkt #11, p. 20). In response, the Commissioner argues that because the medical evidence established that plaintiff did not have non-exertional limitations that significantly diminished her residual functional capacity to work, testimony from a vocational expert was unnecessary (Dkt #13, p. 9).

At the fifth step of the sequential evaluation, the ALJ  must examine whether the claimed impairment is of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy". 42 U.S.C. § 423(d)(2)(A). "In meeting [his] burden of proof on the fifth step of the sequential evaluation process . . . , the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as 'the Grid.' The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in

any other substantial gainful work which exists in the national economy.  Generally the result listed in the Grid is dispositive on the issue of disability."  <u>Zorilla v. Chater</u>, 915 F. Supp. 662, 667 (S.D.N.Y. 1996).  "The Grid classifies work into five categories based on the exertional requirements of the different jobs.  Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling."  <u>Id</u>. at 667 n. 2.

"If a claimant suffers only from exertional impairments, e.g., strength limitations, then the Commissioner may satisfy her burden by resorting to the applicable grids.  For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled."[4]  <u>Pratts v. Chater</u>, 94 F. 3d 34, 38-39 (2d Cir. 1996).  However, where "nonexertional impairments significantly limit the range of work permitted by his exertional limitations . . . application of the grids is inappropriate".[5]  <u>Bapp v. Bowen</u>, 802 F. 2d 601, 605-6 (2d Cir. 1986); <u>see</u> <u>Zorilla</u>, <u>supra</u>, 915 F. Supp. at 667 ("For example, sole reliance on the Grid may be precluded where the claimant's exertional impairments are compounded by significant non-exertional impairments that limit the range of sedentary work that the claimant can perform").  "A

---

[4]      An "exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e. sitting, standing, walking, lifting, carrying, pushing and pulling).  <u>See</u> 20 C.F.R. §404.1569a(b).

[5]      A "non-exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands, including difficulty maintaining attention or concentration, or function because of nervousness, anxiousness or depression.  20 C.F.R. §404.1569a(c).

claimant's work capacity is 'significantly diminished' if there is an . . . additional loss of work capacity . . . that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Pratts, supra, 94 F. 3d at 39.  In these circumstances, the Commissioner "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." Bapp, supra, 802 F. 2d at 603.

ALJ McGuan found that plaintiff's non-exertional limitation was that she could only "occasionally understand, remember and carry out complex and detained tasks and occasionally interact with the public", but concluded that these "nonexertional limitations do not significantly comprise the ability to perform work at all exertional levels" (T26).  ALJ McGuan then proceeded to apply the Grid in order to determine whether plaintiff was disabled (Id.)

Although ALJ McGuan properly relied on the reports submitted by the consulting physicians and plaintiff's treating counselor in determining plaintiff's RFC, none of the doctors had specifically addressed plaintiff's ability to perform work at all functional levels in light of her non-exertional impairments (T268-72, 317-21, 247-52, 275, 279-91). Dr. Butensky, a consultative examiner, noted that plaintiff would require a "flexible employer", and that there may be some limits to how long she can work on any given day (T321).  Moreover, Dr. Dickinson, recommended that "when matters are more stable, . . . [a] referral to the Office of Vocational Rehabilitation for practical job counseling" would be warranted (T272).  On September 27, 2000, Rebecca Rechlin, a vocational specialist at

Horizon recommended in September of 2000 that plaintiff undergo a full vocational assessment and evaluation (T210-14).

Furthermore, I find that the record as a whole would not permit ALJ McGuan, a layperson, to make the necessary inference that claimant can perform the non-exertional requirements of work at all exertional levels.  See Balsamo, supra, 142 F. 3d at 81-82.  Not a single opinion of either the examining or the treating physicians specifically indicates how many hours plaintiff could work in a day given her moderate limitations in concentration and attention.  Nor does the record contain any evidence as to "what type of jobs, if any, plaintiff's circumstances would allow [her] to perform."  Parker v. Harris,  626 F. 2d at 225, 230 (2d Cir. 1980).

For these reasons, I conclude that ALJ McGuan's reliance on the Grid was improper.


## CONCLUSION

For these reasons, I recommend that the Commissioner's motion for judgment on the pleadings (Dkt. #8) be DENIED, and that plaintiff's motion for judgment on the pleadings (Dkt. #10) be GRANTED to the extent that it seeks to vacate the Commissioner's determination and to remand the case to the Commissioner for further proceedings consistent with this Report and Recommendation, and otherwise be DENIED. Pursuant to 28 U.S.C. §636(b)(1), it is hereby

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

-23-

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co., 840 F. 2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F. 2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority. Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report and Recommendation, may result in the District Judge's refusal to consider the objection).

**SO ORDERED.**

Dated: March 27, 2008

JEREMIAH J. MCCARTHY
United States Magistrate Judge

P:\JJM\R&R - Jackson v. Barnhart (06-213).wpd